Slip Op. 21-38

UNITED STATES COURT OF INTERNATIONAL TRADE

SHANXI HAIRUI TRADE CO., LTD., SHANXI
PIOONER HARDWARE INDUSTRIAL CO., LTD.,
SHANXI YUCI BROAD WIRE PRODUCTS CO., LTD.,

Plaintiffs,

and

DEZHOU HUALUDE HARDWARE
PRODUCTS CO., LTD.,

Consolidated Plaintiff,

and

XI'AN METALS & MINERALS IMPORT &
EXPORT CO., LTD.,

Plaintiff-Intervenor,

v.

UNITED STATES,

Defendant,

and

MID CONTINENT STEEL & WIRE, INC.,

Defendant-Intervenor.

Before: Leo M. Gordon, Judge

Consol. Court No. 19-00072

**OPINION**

Dated: April 7, 2021

[Commerce's <u>Final Results</u> sustained.]

Jeffrey S. Neeley and Stephen W. Brophy, Husch Blackwell, LLP of Washington, DC for Plaintiffs Shanxi Hairui Trade Co., Ltd., Shanxi Pioneer Hardware Industrial Co., Ltd. and Shanxi Yuci Broad Wire Products Co., Ltd.

Lizbeth R. Levinson, Ronald M. Wisla, and Brittney R. Powell, Fox Rothschild LLP of Washington, DC for Plaintiff Dezhou Hualude Hardware Products Co., Ltd.

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, deKieffer & Horgan, PLLC of Washington, DC for Plaintiff-Intervenor Xi'an Metals & Minerals Import & Export Co., Ltd.

Sosun Bae, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC for Defendant United States. With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Patricia McCarthy, Assistant Director. Of counsel on the brief was Ayat Mujais, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC.

Adam H. Gordon and Ping Gong, The Bristol Group PLLC of Washington, DC for Defendant-Intervenor Mid Continent Steel & Wire, Inc.

Gordon, Judge: This action involves the final results of an administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping ("AD") order ("Order") on certain steel nails from the People's Republic of China ("PRC").  See Certain Steel Nails from the People's Republic of China, 84 Fed. Reg. 24,751 (Dep't of Commerce May 29, 2019) (amend. final results admin. review) ("Final Results"); see also Issues and Decision Memorandum (Dep't of Commerce Apr. 17, 2019), available at https://enforcement.trade.gov/frn/summary/prc/2019-08273-1.pdf (last visited this date) ("Decision Memorandum").

Before the court are motions for judgment on the agency record under USCIT Rule 56.2 filed by Plaintiffs Shanxi Hairui Trade Co., Ltd., Shanxi Pioneer Hardware Industrial Co., Ltd., Shanxi Yuci Broad Wire Products Co., Ltd. (collectively, "Shanxi"),

Dezhou Hualude Hardware Products Co., Ltd. ("Dezhou Hualude"), and Plaintiff-Intervenor Xi'an Metals & Minerals Import & Export Co., Ltd. ("Xi'an Metals").   See Shanxi's Mot. for J. on the Agency R., ECF No. 31 ("Shanxi Br."); Dezhou Hualude's Mot. for J. on the Agency R., ECF No. 35 ("Dezhou Br."); Xi'an Metals' Mot. for J. on the Agency R., ECF No. 36 ("Xi'an Br."); see also Def.'s Resp. Opp. Pl.'s Mot. for J. on the Agency R., ECF No. 38 ("Def.'s Resp."); Def.-Intervenor Mid Continent Steel & Wire, Inc.'s Resp. to Pl.'s Mot. for J. on the Agency R., ECF No. 41 ("Def.-Intervenor's Resp.); Shanxi's Reply in Supp. of Mot. for J. on the Agency R., ECF No. 45 ("Shanxi Reply"); Dezhou Hualude's Reply in Supp. of Mot. for J. on the Agency R., ECF No. 46 ("Dezhou Reply"); Xi'an Metals' Reply in Supp. of Mot. for J. on the Agency R., ECF No. 49 ("Xi'an Reply").[1] The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018)[2], and 28 U.S.C. § 1581(c) (2018). For the reasons set forth below, the court sustains the Final Results.

## I.      Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.

---

[1] All citations to parties' briefs and the agency record are to their confidential versions unless otherwise noted.

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

Nippon Steel Corp v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006).

Substantial evidence has been described as "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v.

United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as

"something less than the weight of evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent an administrative agency's

findings from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n,

383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence" is best

understood as a word formula connoting a reasonableness review. 3 Charles H. Koch, Jr.,

Administrative Law and Practice § 9.24[1] (3d ed. 2021).  Therefore, when addressing a

substantial evidence issue raised by a party, the court analyzes whether the challenged

agency action "was reasonable given the circumstances presented by the whole record."

8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2020).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural

Res. Def. Council, Inc., 467 U.S. 837, 842–45 (1984), governs judicial review of

Commerce's interpretation of the Tariff Act. See United States v. Eurodif S.A., 555 U.S.

305, 316 (2009) (An agency's "interpretation governs in the absence of unambiguous

statutory language to the contrary or unreasonable resolution of language that is

ambiguous.").

## II.    Discussion

### A.  Application of AFA to Dezhou Hualude

During the verification process for Dezhou Hualude's supplier, Tianjin Lingyu, Commerce observed the presence of certain boxes of steel nails labeled "Made in Thailand" at Tianjin Lingyu's plant. <u>Decision Memorandum</u> at 20.  Commerce found this to be evidence of fraudulent transshipment activity aimed at the circumvention of the Order, stating:

> we observed and photographed empty boxes ready for packaging and sealed boxes ready for shipping which were labeled as certain types of steel nails. The boxes were designated for importation into the United States (*i.e.*, identified as certain types of nails, in English, under the brands of two U.S. companies). The boxes were labeled "Made in Thailand." … Because the aforementioned nails were indeed produced by Tianjin Lingyu but falsely labeled as Thai origin at its Chinese factory, we find that this is evidence of fraudulent transshipment activity, and calls into question the veracity, completeness, and accuracy of all of the information provided by Tianjin Lingyu.

<u>Id.</u>  Commerce further found that Dezhou Hualude "could or should have been aware" of Tianjin Lingyu's fraudulent activities, and that by failing to deter such behavior on the part Tianjin Lingyu, Dezhou Hualude had significantly impeded the current proceeding pursuant to 19 U.S.C. § 1677e(a)(2)(C).  <u>Id.</u>  Consequently, Commerce applied partial AFA for all nails sold by Dezhou Hualude that were sourced from Tianjin Lingyu.  <u>Id.</u>

Both Dezhou Hualude and Xi'an Metals contend that Commerce's decision to apply partial AFA to Dezhou Hualude on the basis of Commerce's discovery of boxes labeled "Made in Thailand" on the premises of Dezhou Hualude's supplier was

unreasonable.  <u>See</u> Dezhou Br. at 10 ("[T]he record does not contain any evidence whatsoever that Tianjin Lingyu was involved in the alleged fraud or that these boxes were linked in any manner to Dezhou Hualude."); <u>see also</u> Xi'an Br. at 4.  Dezhou Hualude argues that the record shows that "Tianjin Lingyu was not responsible for the packaging and that it [sic] employees and management did not speak English," suggesting that Tianjin Lingyu should not be held responsible for any mislabeling in English. Dezhou Br. at 10.  Xi'an Metals notes that "[Commerce] found no discrepancies with Tianjin Lingyu books and records with respect to the costs of production."  Xi'an Br. at 4.  Additionally, Dezhou Hualude contends that Commerce's determination that Dezhou Hualude impeded the investigation because it could or should have been aware of Tianjin's fraud is unreasonable, maintaining that "there would be no justification under the antidumping statute or other doctrine of law for holding Dezhou Hualude liable for its supplier's fraud." Dezhou Br. at 10.  Dezhou Hualude also argues that it was unreasonable for Commerce to attribute its observations of Tianjin Lingyu's plant to "Dezhou Hualude's sales data or Tianjin Lingyu's production data" because these observations were made outside of the applicable period of review.  <u>Id.</u> at 11.

The Government maintains that Commerce's determination that Tianjin Lingyu was engaged in a fraudulent transshipment scheme during the period of review was reasonable and lawful.  Def.'s Resp. at 8.  In conducting its verification process, Commerce discovered physical evidence indicative of fraudulent transshipment, namely, the boxes labeled "Made in Thailand" at Tianjin Lingyu's plant.  <u>See</u> <u>Decision</u> <u>Memorandum</u> at 21.  In view of evidence clearly consistent with a fraudulent scheme,

Plaintiffs' arguments regarding the supposedly inadvertent nature of Tianjin Lingyu's conduct and reference to certain linguistic gaps are unavailing.  The existence of mislabeled boxes indicating their origin in another country not subject to the Order justifies Commerce's conclusion that Tianjin Lingyu is engaged in a fraudulent transshipment scheme.  Further, Tianjin Lingyu's employees' purported inability to read English does not excuse participation in a fraudulent transshipment scheme.  Given that Commerce found that the evidence on the record indicated that Tianjin Lingyu was involved with a fraudulent transshipment scheme, the court agrees that it was reasonable for Commerce to doubt the "veracity, completeness, and accuracy of all of the information provided by Tianjin Lingyu."  See Decision Memorandum at 21.  Commerce explained that it "takes seriously its role in preventing fraud and evasion on its proceedings, and cannot rely on information from parties who take part in such activities."  Id.

Dezhou Hualude notes that Commerce's observations at the "Tianjin Lingyu verification plant tour occurred outside the current period of review [("POR")] of August 1, 2016 through July 31, 2017," and argues that Commerce's finding of fraud could not be reasonably attributed to "Dezhou Hualude's sales data or Tianjin Lingyu's production data during the POR."  Dezhou Br. at 11.  Dezhou Hualude, however, fails to demonstrate that Commerce's conclusion that Tianjin Lingyu's fraudulent activity occurred during the POR was unreasonable.  First, verifications take place outside the POR due to the retrospective nature of Commerce's administrative reviews, meaning that the agency conducts reviews of entries of subject merchandise after that merchandise is imported

into the United States.  See 19 C.F.R. 351.212(a).  By Dezhou Hualude's rationale, issues discovered during verification could never be relied upon during administrative reviews.

Second, while Dezhou Hualude emphasizes the fact that the boxes were found outside the POR as support for the inference that any fraudulent scheme occurred outside the POR as well, Dezhou Hualude fails to establish that such conclusion is the one and only reasonable inference.  The Government notes that Dezhou Hualude's argument ignores the fact that "[a]lthough the labels on the boxes did not provide a date of sale, Commerce observed several boxes that appeared to have been sitting in the plant for a substantial amount of time, which led Commerce to believe that Tianjin Lingyu sold these falsely labeled boxes during the period of review."  Def.'s Resp. at 6 (citing Verification Report Addendum, CD[3] 261).  Given that Plaintiffs have failed to demonstrate that it was unreasonable for Commerce to infer that Tianjin Lingyu engaged in fraudulent activity during the POR, the court sustains Commerce's finding.  See Tianjin Wanhua Co. v. United States, 41 CIT ___, ___, 253 F. Supp. 3d 1318, 1328 (2017) (emphasizing that claimants challenging Commerce's determinations that choose among various options must demonstrate that their position is the "one and only reasonable" option on the record); Mitsubishi Heavy Indus. Ltd. v. United States, 275 F.3d 1056, 1062 (Fed. Cir. 2001) ("'[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" (quoting Consolidated Edison, Co. v. NLRB, 305 U.S. 197, 229, (1938))).

---

[3] "CD" refers to a document contained in the confidential administrative record.

The more challenging question is whether it was reasonable for Commerce to apply AFA to Dezhou Hualude.  Commerce found no record evidence indicating that Dezhou Hualude was in receipt of goods mislabeled as a part of Tianjin Lingyu's fraudulent transshipment activities.  See Decision Memorandum at 21 ("[W]e… did not find any link between Dezhou Hualude and the U.S. companies identified on the fraudulently marked boxes of nails.").  Nor did Commerce point to any portion of the record demonstrating that Dezhou Hualude was aware of Tianjin Lingyu's fraudulent transshipment activities.  The Government explained that Commerce has a practice of "attributing an unaffiliated party's failure to cooperate to the respondent and drawing an adverse inference when the respondent is in a position to induce the unaffiliated party." Def.'s Resp. at 9.  Consistent with this practice, Commerce determined that applying AFA to Dezhou Hualude based on Tianjin Lingyu's fraud was reasonable given Dezhou Hualude's status as "a significant customer" of Tianjin Lingyu.   See Decision Memorandum at 21.

Having found that Dezhou Hualude was a "significant customer" of Tianjin Lingyu, Commerce determined that Dezhou Hualude was (1) aware or constructively aware of Tianjin's fraudulent transshipment scheme and (2) capable of inducing Tianjin's compliance.  Id.  While Dezhou Hualude emphasizes that there was no information in the record that it was aware of Tianjin Lingyu's engagement in any fraud, Dezhou Br. at 12-13, the court cannot conclude that it was unreasonable for Commerce to apply AFA to Dezhou Hualude given the totality of the record.  Commerce found that the relationship between Dezhou Hualude and Tianjin Lingyu was so significant that the agency could

conclude that Dezhou Hualude should be reasonably held to account for its significant

customer/supplier relationship with Tianjin Lingyu and, thereby, Tianjin Lingyu's

fraudulent activity.  Decision Memorandum at 20.  Specifically, Commerce explained:

> Dezhou Hualude's sales of subject merchandise during the
> POR account for a significant portion of Tianjin Lingyu's total
> production quantity during the POR.  Similarly, Tianjin Lingyu
> is the supplier of a substantial portion of Dezhou Hualude's
> sales of subject merchandise during the POR.  Therefore,
> Dezhou Hualude is not only a significant customer of Tianjin
> Lingyu, but Tianjin Lingyu is a supplier of a substantial portion
> of Dezhou Hualude's sales of subject merchandise.  As a
> result, we find that Dezhou Hualude could, or should, have
> been aware of Tianjin Lingyu's fraudulent transshipment
> activity, and therefore induced Tianjin Lingyu's cooperation by
> refusing to do business with Tianjin Lingyu.  Further, we find
> that Tianjin Lingyu would not be sufficiently deterred from its
> fraudulent conduct if its customer (i.e., Dezhou Hualude) was
> unaffected by Tianjin Liangyu's non-cooperation.

Id. at 21.  The Government argues that Commerce maintains the authority to apply

adverse inferences to a respondent who was situated such that they could have deterred

fraudulent conduct by an unaffiliated party.  See Decision Memorandum at 21 n.105

(citing Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States, 753 F.3d 1227,

1233 (Fed. Cir. 2014)); Def.'s Br. at 9.  In Mueller, the U.S. Court of Appeals for the

Federal Circuit ("Federal Circuit") noted that:

> Mueller had an existing relationship with supplier Ternium.
> Therefore, Mueller could potentially have refused to do
> business with Ternium in the future as a tactic to force
> Ternium to cooperate… if the cooperating entity has no
> control over the non-cooperating suppliers, a resulting
> adverse inference is potentially unfair to the cooperating
> party.

Id. at 1235.  As in Mueller, here Commerce found that Dezhou Hualude and Tianjin Lingyu had a significant customer/supplier relationship such that Dezhou Hualude could have potentially refused to do business with Tianjin Lingyu as a tactic to induce Tianjin Lingyu to desist from its participation in a fraudulent transshipment scheme.  Cf. Mueller, 753 F.3d at 1233.  However, Dezhou Hualude did not take such steps, therefore, Commerce's decision to rely on partial AFA with respect to Dezhou Hualude was reasonable.  At the same time, under the circumstances, Commerce determined that "total AFA is not appropriate because we have no evidence that the issues identified above have impacted Dezhou Hualude's sales of subject merchandise produced by other suppliers."  Decision Memorandum at 22.

Dezhou Hualude highlights that various concerns about the respondents' behavior and particular circumstances raised in Mueller are not present here.  See Dezhou Reply at 3–7 (distinguishing the scenario in Mueller, where "uncooperative supplier could avoid its own AFA rate and funnel its sales though the cooperative mandatory respondent that was subject to a lower duty deposit rate," from circumstances in this matter).  Dezhou Hualude argues that Commerce's determination here lacks "an inducement or a deterrent impact on Tianjin Lingyu" that would justify the application of application of AFA to Dezhou Hualude as a cooperative party.  Id. at 7.  Dezhou Hualude, however, omits the key consideration for Commerce's decision to apply AFA here, namely, Dezhou Hualude was a significant customer of a supplier engaged in a fraudulent transshipment scheme involving subject merchandise.

As Commerce explained, it maintained "serious concerns with Tianjin Lingyu's actions (i.e., producing fraudulently marked boxes of nails and providing contradictory and inaccurate information at verification), which not only reflect a failure to cooperate that warrants application of an adverse inference, but also raise serious concerns regarding attempts to undermine the administrative process." Decision Memorandum at 22. Commerce thus concluded that it "takes such issues seriously, and … intend[s] to share with CBP evidence gathered in the course of our proceedings. In addition, [the agency] will continue to look into this matter further in any future proceeding involving Tianjin Lingyu." Id.  In Mueller, the court stated that "[t]o the extent that Commerce chooses to rely on inducement/evasion considerations, its approach must be reasonable[,]" and the court clarified that it did not "decide whether relying on inducement/evasion rationales to calculate Mueller's rate would be reasonable in the circumstances of this case." Mueller, 753 F.3d at 1236.  Here, Commerce concluded that its discovery of evidence of a fraudulent transshipment scheme justified the use of partial AFA as to Dezhou Hualude so that it had an incentive to take steps to either induce Tianjin Lingyu to cease its fraudulent activities or cease using Tianjin Lingyu as a supplier.  Based on the record, the court concludes that Commerce reasonably determined that Dezhou Hualude "could or should reasonably have been aware" of Tianjin Lingyu's fraud and further that Dezhou Hualude should have exercised its influence to induce Tianjin Lingyu to desist from any fraudulent activity.  See Decision Memorandum at 21.  Accordingly, the

court sustains as reasonable Commerce's finding that Dezhou Hualude impeded the investigation and its consequent determination to apply partial AFA.[4]

### B. Calculation of Sample Rate for Cooperative Non-Selected Respondents

"If it is not practicable [for Commerce] to make individual weighted average dumping margin determinations" for each exporter or producer "involved in the investigation or review", 19 U.S.C. § 1677f-1(c)(2) authorizes Commerce to limit its examination of respondents to either (A) a statistically valid sample of respondents; or (B) respondents accounting for the largest volume of the subject merchandise under review.   19 U.S.C. § 1677f-1(c)(2).   Commerce's general practice during AD administrative reviews is to select respondents pursuant to § 1677f-1(c)(2)(B).  See Decision Memorandum at 7; see also Sample Methodology Notice, 78 Fed. Reg. 65,963, 65,964 ("Sample Methodology").   When Commerce selects respondents pursuant to § 1677f-1(c)(2)(B), Commerce's practice has been to look to 19 U.S.C. § 1673d(c)(5) for guidance when calculating the separate rate for respondents not examined in an administrative review (the "separate rate" or "sample rate"), even though § 1673d(c)(5)

---

[4] Since the court sustains Commerce's application of partial AFA on this basis, Dezhou Hualude's remaining arguments challenging Commerce's analysis of its factors of production for water coating and the agency's refusal to incorporate Tianjin Lingyu's minor corrections to FOP's at verification are rejected as moot.  See Dezhou Br. at 13–16, 16-17; Decision Memorandum at 23 & 27 ("Since we are applying partial AFA for Dezhou Hualude's sales of subject merchandise produced by Tianjin Lingyu, we find this issue moot and will not address it….  With respect to Tianjin Lingyu's revised FOP database, as discussed above in Comment 4, because we are not relying on Tianjin Lingyu's information for these final results and instead applying partial facts available to these sales, we are not accepting these minor corrections.").

expressly applies to investigations (as opposed to administrative reviews).[5]  See Decision Memorandum at 10; see also 19 U.S.C. § 1673d(c)(5)(A) ("For purposes of this subsection and section 1673b(d) of this title, the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title.").

In 2013, Commerce adopted a new practice to normally select respondents pursuant to § 1677f-1(c)(2)(A) under certain conditions.  Specifically, Commerce explained that it would proceed under § 1677f-1(c)(2)(A), rather than § 1677f-1(c)(2)(B) when the following conditions are met:

> (1) There is a request by an interested party for the use of sampling to select respondents; (2) the Department has the resources to examine individually at least three companies for the segment; (3) the largest three companies (or more if the Department intends to select more than three respondents) by import volume of the subject merchandise under review account for normally no more than 50 percent of total volume; and (4) information obtained by or provided to the Department provides a reasonable basis to believe or suspect that the average export prices and/or dumping margins for the largest exporters differ from such information that would be associated with the remaining exporters.

---

[5] The statute also explicitly applies only to market economy proceedings, see Decision Memorandum at 10, but Commerce has adopted it in non-market economy proceedings as well.  See Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1374 (Fed. Cir. 2013).  Beyond mentioning that the express text of the statute only covers market economy proceedings, Commerce has not provided any rationale for why the calculation of the separate rate should be any different in light of the non-market economy context here.  See generally Decision Memorandum.

Sample Methodology, 78 Fed. Reg. at 65,964–65; see also Decision Memorandum at 8.
Commerce explained that it was adopting this policy change due to the concern that since
smaller exporters would not be selected for individual examination under
§ 1677f-1(c)(2)(B), they "may decide to lower their prices as they recognize that their
pricing behavior will not affect the AD rates assigned to them." See Sample Methodology,
78 Fed. Reg. at 65,964; Decision Memorandum at 7–8.  Commerce further stated that
under the new practice it would, on a case-by-case basis, include all determined rates,
including those based entirely on AFA, in the separate rate calculated for non-selected
respondents.   See Sample Methodology, 78 Fed. Reg. at 65,968–69; Decision
Memorandum at 10, 12–13.

In the Final Results, Commerce determined that it would select mandatory
respondents for the review pursuant to 19 U.S.C. § 1677f-1(c)(2)(A) in accordance with
its new practice.  Decision Memorandum at 9 ("In short, we determined that given the
large disparity between Stanley's calculated margins and the margins assigned to the
other respondents in the past eight administrative reviews, this raised the exact same
evasion concern that was expressed in the Sampling Methodology Notice.  Therefore,
in light of these concerns, we appropriately relied on a statistically valid sample to select
respondents in this review.").   Commerce determined that it was not bound by
§ 1673d(c)(5) because administrative reviews are conducted pursuant to 19 U.S.C.
§ 1677f-1(c)(2).  Id. at 10, 12.  Commerce stated that there is no statute that addresses
the establishment of a rate to be applied to individual companies not selected for
examination in an administrative review conducted pursuant to 19 U.S.C. § 1677f-1(c)(2).

Id. at 10.  Despite this broad statement, Commerce acknowledged that "in administrative reviews involving non-market economy countries, where Commerce does not employ sampling as discussed below, Commerce's practice has been to look to section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in investigations, for guidance when calculating the separate rate for respondents not examined in an administrative review."  Id.

Commerce explained that it found § 1673d(c)(5) to be inapplicable in this proceeding as "Commerce has selected respondents through sampling under section 777A(c)(2)(A) of the Act, as opposed to relying on the largest producers/exporters under section 777A(c)(2)(B) of the Act."  Id. at 11.  Commerce noted that "[w]hile there are situations when it is not appropriate to include AFA or zero/de minimis rates in the rate to be applied to companies whose entries are not individually examined, Commerce's determination on whether to include or exclude these rates in this case is based on Commerce's method of respondent selection through sampling and the fact that this is an administrative review and not an investigation."  Id.  Commerce concluded "that excluding AFA rates from the sample rate would give respondents the ability to manipulate the all others rate," and that "including AFA rates in the sample rate" is important "to maintain the validity of the sample."  Id.  Consequently, Commerce included the AFA rate assigned to Shandong Dinglong, a mandatory respondent that "received a rate based on AFA based on its withdrawal from the review," in its calculation of the sample rate in the Final Results.  See id. at 10, 12–13.

Commerce noted that its authority to exercise discretion in calculating the sample rate was affirmed by this Court when challenged in two prior cases.  See Decision Memorandum at 10 n.43, 11, & 12 n.51 (citing Asociacion Colombiana de Exportadores de Flores v. United States, 13 CIT 13, 704 F. Supp. 1114 (1989), aff'd, 901 F.2d 1089 (Fed. Cir. 1990), and Laizhou Auto Brake Equip. Co. v. United States, 32 CIT 711 (2008)). In Asociacion, the court considered Commerce's use of sampling and noted that Commerce was justified in including "in its all other rate best information rates for companies selected for the sample who did not respond to questionnaires." Asociacion, 13 CIT at 21 n.11, 704 F. Supp. at 1121 n.11.  The court explained that "[i]n a random sampling situation, to exclude such non-responding companies from the all other rate would undermine the overall methodology.  This case is distinguishable from non-random sampling cases on this point." Id.

In Laizhou, Commerce conducted an administrative review by selecting respondents pursuant to 19 U.S.C. § 1677f-1(c)(2)(A), and included in its calculation of the sample rate all individually investigated respondents, including two de minimis rates and one rate based on AFA.  Laizhou, 32 CIT at 713–14, 724.  The court affirmed Commerce's inclusion of an AFA rate in the sample rate calculation, explaining that because administrative reviews conducted pursuant to § 1677f-1(c)(2)(A) require that a statistically valid pool of respondents be selected for calculating the rate for non-selected respondents,   Commerce may compute "a statistically valid sample rate that is representative of the population as a whole" that "include[s] the margins determined for all selected respondents, even if that sample rate happens to be composed in part on a

respondent's rate which is based on adverse facts available."   See Laizhou, 32 CIT at 723–24.  The court rejected plaintiffs' argument in Laizhou that Commerce's approach "punishes fully cooperative parties by assigning them a rate unfairly inflated by the non-cooperation of another party," reasoning that a "sample rate by its nature cannot meet the precision of an individualized rate as to any given party."  Laizhou, 32 CIT at 724 (internal quotations omitted).  The court further noted that "companies that would otherwise have received an individualized rate lower than the sample rate will in a sense be punished while those that would otherwise have received a higher rate will benefit. This element is an inherent and accepted part of any sample."  Id.

Shanxi and Xi'an Metals ("separate rate Plaintiffs") now challenge Commerce's sample rate calculation methodology in the Final Results.  While the separate rate Plaintiffs concede that Asociacion and Laizhou appear to support the lawfulness of Commerce's sample rate calculation in the final results, the separate rate Plaintiffs "respectively request that the Court consider these opinions in light of the law, and the facts of this case," arguing that "[a]n important issue appears not to have been addressed in these cases, specifically, whether Commerce's methodology was consistent with the express requirements of the statute."  Shanxi Br. at 5.  The separate rate Plaintiffs further note that subsequent decisions have called into question "the reasonableness of this methodology, as applied to this appeal."  Id.

The separate rate Plaintiffs argue that 19 U.S.C. § 1677f-1(c)(2) does not address how to calculate the sample rate, and that Commerce's interpretation of § 1677f-1(c)(2) (and its refusal to apply § 1673d(c)(5) in this context) creates an unreasonable distinction

that runs contrary to the statutory scheme as a whole.  <u>See</u> Xi'an Br. at 6 ("This statutory scheme also makes no distinction between selecting mandatory respondents using a volume or sampling methodology."); Shanxi Reply at 2–3 (arguing that Commerce's interpretation "ignores the rules of statutory interpretation which provide that a statute must be read as a whole.").  They maintain that § 1677f-1(c)(2) merely establishes the methods that Commerce may choose from in selecting respondents for both administrative reviews and initial investigations, and that regardless of the respondent selection method, the separate rate calculation methodology is controlled by § 1673d. <u>See</u> Shanxi Br. 5–8.  Therefore, the separate rate Plaintiffs contend that Commerce's inclusion of Shandong Dinglong's AFA rate in the sample rate of the <u>Final Results</u> was unlawful as Commerce's methodology violated the limitations of § 1673d(c)(5).  <u>See</u> <u>id.</u> (citing § 1673d(c)(5) and Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1 at 873).

While the separate rate Plaintiffs first argue that "the plain language of the statute" dictates a ruling in its favor, their proposed statutory interpretation would have the court ignore the introductory clause of § 1673(c)(5)(A), which limits the requirements of that provision to investigations.  <u>See</u> Shanxi Br. at 7; 19 U.S.C. § 1673(c)(5)(A); <u>see also</u> Xi'an Br. at 6–7.  Contrary to the separate rate Plaintiffs' contentions, the statute is silent as to the precise question of how Commerce should calculate the separate rate in administrative reviews, and the court must consider whether Commerce's interpretation and application of the statute here is reasonable.  <u>See Chevron</u>, 467 U.S. at 842–43 ("When a court reviews an agency's construction of the statute which it administers, it is

confronted with two questions.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. …. if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

Commerce explained that its interpretation of the proper sample rate calculation methodology under § 1677f-1(c)(2)(A) was reasonable because "excluding AFA rates from the sample rate would give respondents the ability to manipulate the all others rate," and that "including AFA rates in the sample rate" is important "to maintain the validity of the sample."  Id. at 11.  Commerce noted that "the underlying methodology in a random sampling context creates an expectation that the dumping behavior of the selected firms is representative of the population as a whole," which Commerce maintains "is not present when respondents are selected based on the largest volume," pursuant to § 1677f-1(c)(2)(B).  Id.  Commerce further noted that its selected methodology reflected its concerns about rate manipulation by non-selected respondents in this proceeding.  Specifically, Commerce stated:

> Commerce finds that it is appropriate in this review to include all rates to address concerns that the average export prices and/or dumping margins for the largest exporter (i.e., Stanley) differs from the remaining exporters, and to include companies under review with relatively small import volumes that have effectively been excluded from individual examination.  Prior to our use of sampling, these companies maintained a "free-pass" by successfully obtaining a separate rate that would be based solely, or largely, on Stanley's

> margin.    Further, our experience in this proceeding, as
> outlined above, is that when we selected additional mandatory
> respondents, these companies either stopped cooperating
> after selection as a mandatory respondent, or would be found
> dumping at margins much higher than Stanley's margin.

Decision Memorandum at 13.   Given these concerns about the expected behavior of

non-selected respondents, and particularly because of the specific enforcement concerns

identified over the course of the proceeding, Commerce concluded:

> Therefore, our use of sampling, and our decision to maintain
> all three rates, including an AFA rate, in the sample rate, is
> consistent with the evasion concerns expressed in the
> Sampling Methodology Notice and our specific evasion
> concerns regarding the large disparity between Stanley's
> calculated margins and the margins assigned to the other
> respondents in the past eight administrative reviews.  Indeed,
> the fact that one of the three mandatory respondents in this
> review provided a separate rate response, then withdrew from
> participation after it was selected as a mandatory respondent
> based on sampling, is reflective of our experience of the non-
> Stanley respondents in the history of this proceeding, as
> outlined above.  This further demonstrates that the inclusion
> of the company's AFA rate in the sample rate is indicative of
> the population as a whole.

Id.

As mentioned above, Commerce supported its rationale by relying on Laizhou and

Asociacion, which affirmed Commerce's inclusion of AFA rates in the sample rate.  See

id. at 11–12.  Shanxi argues that Laizhou and Asociacion were decided prior to the

decision by the Federal Circuit in Albemarle Corp. v. United States, 821 F.3d 1345 (Fed.

Cir. 2016).  The separate rate Plaintiffs maintain that Albemarle held that § 1673d(c)(5)

applies equally in the context of administrative reviews as it does to investigations.  Shanxi

Br. at 3–4 (quoting Albemarle, 821 F.3d at 1352–53).   In Albemarle, Commerce

conducted an administrative review and selected respondents pursuant to 19 U.S.C. § 1677f-1(c)(2)(B).   See 821 F.3d at 1348, 1353.   The two individually examined respondents were assigned de minimis margins.  Id. at 1349.  Commerce proceeded to calculate separate rates for the non-selected respondents "based on the margins it had assigned them during the previous review period."   Id.  The Federal Circuit noted that even though Commerce was conducting an administrative review, Commerce could not reasonably avoid the rate calculation method established in 19 U.S.C. § 1673d(c)(5), as Commerce itself had found that § 1673d applied in the underlying proceeding.  See id. at 1351–53.   Therefore, since the individually examined respondents were assigned de minimis margins, the rate Commerce applied to non-selected respondents should be calculated pursuant to the "expected method" in § 1673d(c)(5)(B).  See id. ("the expected method to calculate the separate rate in such circumstances is to average the individually examined respondents' de minimis margins.").   The court rejected Commerce's attempt to bypass the "expected method" § 1673d(c)(5)(B), noting that Commerce's argument that there was no evidence demonstrating that the "separate rate respondents engaged in pricing behavior similar to the [mandatory respondents]" was "backwards."   See id. at 1353.   The court clarified that in order for Commerce to deviate from the statute's expected method, the burden was on Commerce to "find based on substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different."  Id.

Although separate rate Plaintiffs here cite language in Albemarle that appears to support their preferred interpretation of 19 U.S.C. § 1677f-1(c)(2), their reliance on

Albemarle is misplaced.  See Shanxi Br. at 3–4; Xi'an Br. at 6.  In Albemarle, Commerce

determined that § 1673d(c)(5) applied in the underlying proceeding, but Commerce failed

to provide a reasonable basis for deviating from that provision's terms.  See id.

at 1352-53.  Here, Commerce rejected the applicability of 19 U.S.C. § 1673d(c)(5)(A),

stating that its separate rate calculation is solely based on the terms of § 1677f-1(c)(2)(A).

See Decision Memorandum at 11–12.  Accordingly, the decision in Albemarle is not

outcome-determinative with respect to separate rate Plaintiffs' challenges presented in

this matter.

        The separate rate Plaintiffs also argue that Commerce lacks discretion to include

AFA rates when calculating the sample rate during administrative reviews conducted

pursuant to 19 U.S.C. § 1677f-1(c)(2)(A).  Shanxi Reply at 4; see also Shanxi Br. at 7–8.

This argument is unpersuasive.  The express prohibition on the inclusion of AFA rates

found in § 1673d(c)(5)(A) for calculating the all-others rate in investigations is not found

in any statutory provision covering administrative reviews.  Congress, therefore, through

omission, left Commerce with discretion of how to handle AFA rates when calculating the

all-others rate in administrative reviews.  And here, separate rate Plaintiffs omit any

mention of Commerce's reasonable exercise of that discretion through its explanation that

its rate calculation methodology was predicated on its "evasion concerns expressed in

the Sampling Methodology Notice and our specific evasion concerns regarding the large

disparity between Stanley's calculated margins and the margins assigned to the other

respondents in the past eight administrative reviews."  Decision Memorandum at 13.

Commerce further emphasized "that one of the three mandatory respondents in this

review provided a separate rate response, then withdrew from participation after it was selected as a mandatory respondent based on sampling, is reflective of our experience of the non-Stanley respondents in the history of this proceeding."  Id.

19 U.S.C. § 1677f-1(c)(2)(A) authorizes Commerce to employ a statistically valid sampling method when choosing respondents to investigate, but does not instruct Commerce as to how to reach a statistically valid result in calculating the sample rate, the purpose of having a statistically valid sample in the first place.  See Laizhou, 32 CIT at 713–14, 724.  In light of the silence of § 1677f-1(c)(2) on the matter, separate rate Plaintiffs' argument that § 1673d(c)(5) should control Commerce's rate calculation methodology has some intuitive merit; however, the court cannot conclude that Congress intended to narrowly limit Commerce's rate calculation authority in such a manner, especially given the threat of evasion that Commerce identified in the underlying proceeding.

The separate rate Plaintiffs argue in the alternative that "[e]ven if the Court determines that Commerce's methodology is not contrary to the express terms of the statute, the methodology is unreasonable."  Shanxi Br. at 9.  Separate rate Plaintiffs state  that "[w]hile the courts have held that Commerce is theoretically allowed to average a de minimis rate and an AFA rate to determine the margin for cooperative non-mandatory respondents when the statutory exception is applicable, the courts have consistently found the methodology unreasonable in practice."  Id.  Commerce determined that it is necessary to include AFA rates in calculating the sample rate in order "to maintain the validity of the sample."  Decision Memorandum at 11.  Commerce explained that

"because a random sampling procedure was used, Commerce reasonably estimated, in accordance with statistical sampling principles, that other exporters in the population might also have received these rates, had the non-selected firms been individually examined," and concluded that exclusion of AFA rates would undermine the sample being "indicative of the population as a whole." Id. at 12.

Separate rate Plaintiffs cite to other decisions that held Commerce's separate rate calculation methodology to be unreasonable due to the inclusion of AFA rates in the calculation. See Shanxi Br. at 9 (citing Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370 (Fed. Cir. 2013) and Baroque Timber Indus. (Zhongshan) Co. v. United States, 38 CIT ___, ___, 971 F. Supp. 2d 1333, 1342 (2014)). Separate rate Plaintiffs' reliance on these decisions is also misplaced as they did not involve Commerce's use of the sampling methodology under § 1677f-1(c)(2)(A). Here, Commerce determined that the inclusion of the results of AFA-rate respondents is necessary "to maintain the validity of the sample." See Decision Memorandum at 11–13.

Separate rate Plaintiffs maintain that "there is no basis to impute any measure of AFA" to Plaintiffs "just because one company declined to respond to the Department's request for information." Shanxi Br. at 10. Further, the separate rate Plaintiffs argue that Commerce's reason for including AFA rates, specifically when selecting respondents via sampling pursuant to § 1677f-1(c)(2)(A), ignores the fact that Commerce's alternate selection method (based on volume under § 1677f-1(c)(2)(B)) assumes that the largest volume exporters "will be representative of all other companies not selected for examination." Id. (citing Albemarle, 821 F.3d at 1353). Therefore, the separate rate

Plaintiffs contend that Commerce cannot reasonably justify including AFA rates in the sampling context solely to ensure "representativeness."  See id. at 10–11.

Administrative reviews conducted pursuant to 19 U.S.C. § 1677f-1(c)(2)(B) are assumed to be representative of all other companies not selected for examination.  See Albemarle, 821 F.3d at 1353 ("The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters.").  19 U.S.C. § 1677f-1(c)(2)(A) requires that Commerce use a statistically valid sample of individually investigated respondents when calculating an average rate for non-selected respondents.  Pursuant to § 1677f-1(c)(2)(A), Commerce is obligated to ensure that the sampling process it uses results in a selection that is representative of non-selected respondents.  See 19 U.S.C. § 1677f-1(c)(2)(A); see also Laizhou, 32 CIT at 724 ("Suffice it to say that the point of requiring selection from a statistically valid pool of respondents is to arrive at a statistically valid dumping rate."); Decision Memorandum at 11 ("the underlying methodology in a random sampling context creates an expectation that the dumping behavior of the selected firms is representative of the population as a whole.").  Therefore, the volume-based selection of respondents under § 1677f-1(c)(2)(B) and Commerce's practice of applying the rate calculation method of § 1673d(c)(5)(A) are distinguishable from the scenario presented here, where Commerce has determined that under § 1677f-1(c)(2)(A) it may include AFA rates in the sample rate calculation on a case-by-case basis.

The separate rate Plaintiffs' argument also ignores the history of the previous eight administrative reviews in which other selected respondents were non-responsive.

See Decision Memorandum at 13; see also Def.-Intervenor's Resp. at 14–15.  Commerce

explained that "[i]n determining to base respondent selection on sampling, we found that

the information provided by the petitioner (i.e., company margins from previous segments

of the proceedings) provided a reasonable basis to believe or suspect that the average

dumping margins for the exporter who has consistently been examined as one of the

largest exporters in each review (Stanley) differ from dumping margins that would be

associated with the remaining exporters."  Decision Memorandum at 9.  Commerce also

noted:

> in each of the eight administrative reviews under this order,
> Stanley has consistently been one of the largest exporters,
> and has been selected as a mandatory respondent. In
> addition, Stanley has consistently been a cooperative
> respondent, and its average calculated weighted-average
> dumping margin over the previous eight administrative
> reviews is 7.02 percent.  In contrast, in each of the eight
> administrative reviews, the other mandatory respondents
> either obtained a much higher calculated margin, did not
> qualify for a separate rate, or were otherwise non-cooperative
> and received a margin based on total [AFA]. … the average
> margin for respondents other than Stanley, including non-
> calculated margins, is 106.77 percent.  Even when we do not
> include those non-calculated margins, the average margin for
> respondents other than Stanley is 105.71 percent.  Moreover,
> throughout the history of the proceeding, the China-wide rate,
> assigned to those respondents who have failed to
> demonstrate their independence from the China-wide entity,
> has remained 118.04 percent.

Id.  Accordingly, Commerce concluded by determining that "our use of sampling, and our

decision to maintain all three rates, including an AFA rate, in the sample rate, is consistent

with the evasion concerns expressed in the Sampling Methodology Notice and our

specific evasion concerns regarding the large disparity between Stanley's calculated

Consol. Court No. 19-00072                                                    Page 28

margins and the margins assigned to the other respondents in the past eight administrative reviews." <u>Id.</u> at 13. Given Commerce's findings as to the potential for evasion in this proceeding, the court cannot conclude that Commerce acted unreasonably by determining that this pattern of non-responsiveness by smaller respondents randomly selected for review was representative of the likely behavior of non-selected respondents. Therefore, the court sustains as reasonable Commerce's sample rate calculation methodology in the <u>Final Results</u>.

### III.   Conclusion

For the foregoing reasons, the court sustains the <u>Final Results</u>. Judgment will enter accordingly.


                                                              /s/ Leo M. Gordon
                                                          Judge Leo M. Gordon


Dated: April 7, 2021
        New York, New York